POOLER, Circuit Judge:
The County of Rensselaer (“Rensse-laer”) and Rensselaer County Drug & Gang Task Force (“Task Force”) Investigator, Michael Riley (“Riley”), appeal from a judgment of the United States District Court for the Northern District of New York (Lawrence Kahn, J.) denying summary judgment on their claims of qualified immunity for purported violations of the Fourth Amendment and state tort law based upon omissions made by Riley in the application for a search warrant of Ronita McColley’s home. We conclude that disputed material factual issues underlie the district court’s denial of qualified immunity, and thus dismiss the appeal for lack of jurisdiction.
BACKGROUND
I.
Ronita McColley (“McColley”), a mother with no criminal history or connection to criminality and an employee at the Center for Disability Services in Albany, New York, lived with her young daughter in the first floor apartment of 396 First Street in Troy, New York, since 2003. On July 3, 2008, at approximately 6:00 a.m., McColley was awoken in her home by the sound of the City of Troy Police Department Emergency Response Team (“ERT”) knocking down her door and the explosion of a flash-bang grenade. Dressed in all black, wearing face masks, and carrying automatic weapons, the members of the ERT screamed for McColley to get on the floor, but as there was not enough space for her to lie on the floor, a member of the ERT instead shoved McColley face down onto her bed. As she had been roused from sleep, McColley was clad in only a t-shirt and underwear. She repeatedly requested to cover herself but was repeatedly denied. These events took place under the authorization of a no-knock search warrant secured by Riley on June 27, 2008.
In connection with a drug investigation in Troy, Riley submitted a search warrant application to obtain four warrants to search four residences within the city, including McColley’s home. The application was based upon information received from a confidential informant (“Cl”). On June 23, 2008, this Cl, who had performed four controlled buys for the Rensselaer County Drug and Gang Task Force in the past, contacted Riley, advising him that he could purchase crack-cocaine from an individual identified as “Sport.” Riley and other members of the Task Force set up a controlled buy, whereby the Cl purchased crack-cocaine. On June 25, 2008, the Cl again contacted Riley. He told Riley that, on the previous day, he had been taken to the first floor apartment of 396 First Street — McColley’s home — to purchase crack from Sport. The Cl further indicated that a drug dealer he had known for years, “Stink,” was also present at 396 First Street and used a King of Hearts playing card to remove cocaine from a scale. The Cl also noted there was a third male that he did not know in the apartment. The initial report from the Cl and the related affidavit by Riley made no mention of a woman being present in the apartment. Though the Cl indicated that he purchased drugs at 396 First Street on the singular occasion he had visited, the Task Force identified the apartment as a “stash house.”
In addition to the information surrounding 396 First Street, the Cl told Riley about three locations in Troy that were *821 maintained by Stink and Sport — each of their two residences and an apartment leased to Tanisha Bruce, who reportedly sold “approximately one hundred grams of marijuana per week” provided by Stink. The Cl informed Riley that he had visited Bruce’s apartment over twenty times throughout the course of the previous six months with Stink and that Stink had made drug deals on each occasion. Upon Riley asking the Cl whether Stink had “custody and control” of the apartment at 396 First Street, the Cl responded, “Yes.” The Cl apparently did not describe the facts from which he was able to come to this conclusion based on only one visit to 396 First Street, merely indicating that as to 396 First Street, Bruce’s apartment, and Stink’s own apartment, Stink “comes and goes as he pleases.”
On the same day, Riley conducted drive-bys of each of the four locations in order to have the Cl identify them. After the Cl had identified 396 First Street, Riley and his supervisor, Investigator Arthur Hyde, directed undercover officers in both stationary and drive-by surveillance on the apartment. No narcotics or other criminal activity was witnessed during the surveillance. Because the residences were located in a high crime area, the stationary surveillance was not conducted for extended periods of time. Following the identification of 396 First Street and prior to his application for a search warrant, utilizing a Lexis Nexis search and then running a criminal background check, Riley determined that McColley was the resident at that address, that she had no criminal history, and that she had a young child.
On June 27, 2008, Riley submitted an application for a search warrant for 396 First Street to Judge Turner of the City of Troy Criminal Court. The same affidavit was offered in support of search warrants for each of the locations identified by the Cl. Riley identified the information provided by the Cl as the basis for the application. Riley stated that the Cl had previously given information that proved to be “both accurate and reliable” and which “led to five previous drug purchases and two search warrants, which resulted in the seizure of illegal drugs and contraband.”[1] The warrant application recounted the Cl’s description of his interaction with Stink and Sport in the apartment. The affidavit also recounted the details relating to Bruce’s apartment, including that the Cl had visited the apartment between twenty and thirty times over the preceding six-month period and that Stink or Sport made drug deals on each occasion. For each of the search locations with the exception of McColley’s home, Riley identified the resident individual and described his or her ties to drug dealing and criminality. Riley never mentioned McColley’s identity, lack of criminal history, or even the fact that there was a resident who lived at 396 First Street — as opposed to the apartment being a location exclusively used by Stink in his drug dealing enterprise. In the warrant application, Riley also made no mention of the fact that surveillance had been conducted and yielded no evidence or even suspicion of narcotics or other criminal activity.
The search of McColley’s home did not uncover any money, weapons, drugs, drug-related paraphernalia, or any evidence of criminality of any kind. The ERT took only a National Grid electric and gas bill and a registration bill for Hudson Valley Community College as fruits of the search.
*822 II
After McColley filed the instant action, Defendants moved for summary judgment on all'counts. The district court granted summary judgment in part and denied it in part. The court denied summary judgment to Riley on McColley’s Fourth Amendment claim, determining that material questions of fact prevented a finding of qualified immunity. The district court also denied summary judgment on McColley’s related state tort claims as the viability of those claims rested on the determination as to probable cause, which the court already determined was subject to material questions of fact. Rensselaer and Riley now appeal the denial of the claim of qualified immunity.
DISCUSSION
I.
“Ordinarily, orders denying summary judgment do not qualify as ‘final decisions’ subject to appeal.” Ortiz v. Jordan,—U.S.-, 131 S.Ct. 884, 891, 178 L.Ed.2d 703 (2011). There exists a “limited exception to the categorization of summary judgment denials as nonappealable orders,” id., for a “denial of a claim of qualified immunity, to the extent that it turns on an issue of law,” Mitchell v. Forsyth, 472 U.S. 511, 530, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). This Court may “exercise interlocutory jurisdiction if the defendant contests the existence of a dispute or the materiality thereof, or ... contends that he is entitled to qualified immunity even under plaintiffs version of the facts.” Tierney v. Davidson, 133 F.3d 189, 194 (2d Cir.1998). Such a denial of qualified immunity is reviewed by this Court to determine whether “the qualified immunity defense may be established as a matter of law.” Escalera v. Lunn, 361 F.3d 737, 743 (2d Cir.2004) (internal quotation marks omitted). This “review extends to whether a given factual dispute is ‘material’ for summary judgment purposes, ... not ... whether a dispute of fact identified by the district court is ‘genuine.’ ” Id.
The district court determined that there were genuine issues of material fact that prevented a finding of qualified immunity with respect to Riley’s submission of the warrant application. Because the district court determined that Riley made material omissions from the search warrant affidavit such that there was an issue of fact as to whether there was probable cause for the warrant to issue, it also found the same with respect to qualified immunity. While appellate courts cannot generally review denials of summary judgment,
an interlocutory appeal is available “to challenge the trial judge’s rejection of the immunity defense where the defendant contends that on stipulated facts, or on the facts that the plaintiff alleges are true, or on the facts favorable to the plaintiff that the trial judge concluded the jury might find, the immunity defense is established as a matter of law because ... it was objectively reasonable for him to believe that his action did not violate clearly established law.”
Tierney, 133 F.3d at 194 (quoting Salim v. Proulx, 93 F.3d 86, 90-91 (2d Cir.1996)). Jurisdiction may exist “where the lower court rules that material disputes of fact preclude summary judgment on qualified immunity,” when a defendant contests the materiality of the disputed facts or argues “he is entitled to qualified immunity even under the plaintiffs version of the facts.” Id.
In the instant case, Appellants contend that, accepting McColley’s version of the facts, Riley is entitled to qualified immunity because the omissions he made from the search warrant application did not alter *823 the probable cause analysis as a matter of law. In order to determine whether this Court has jurisdiction, we must look to whether, as a matter of law, Riley’s actions — as viewed through the facts taken in a light most favorable to McColley— amount to a constitutional violation. If there is a question as to whether under these facts, Riley’s omissions amounted to a constitutional violation, then this Court does not have jurisdiction because the denial of qualified immunity rested upon factual issues.
II.
A plaintiff can demonstrate that her right not to be searched absent a search warrant supported by probable cause “was violated where the officer submitting the probable cause affidavit ‘knowingly and intentionally, or with reckless disregard for the truth, made a false statement in his affidavit’ or omitted material information, and that such false or omitted information was ‘necessary to the finding of probable cause.’ ” Soares v. Connecticut, 8 F.3d 917, 920 (2d Cir.1993) (quoting Golino v. City of New Haven, 950 F.2d 864, 870 (2d Cir.1991)). Recklessness is inferred when the omitted information was “clearly critical” to the determination of probable cause. Rivera v. United States, 928 F.2d 592, 604 (2d Cir.1991) (internal quotation marks omitted). “The materiality of a misrepresentation or an omission in this context is a mixed question of law and fact. The legal component depends on whether the information is relevant to the probable cause determination under controlling substantive law. But the weight that a neutral magistrate would likely have given such information is a question for the finder of fact, so that summary judgment is inappropriate in doubtful cases.” Velardi v. Walsh, 40 F.3d 569, 574 (2d Cir.1994) (citations omitted). In determining whether omitted information was necessary to the finding of probable cause, “we look to the hypothetical contents of a ‘corrected’ application to determine whether a proper warrant application, based on existing facts known to the applicant, would still have been sufficient to support arguable probable cause to make the arrest as a matter of law.” Escalera, 361 F.3d at 743-44. In performing the “corrected affidavit” analysis, “we examine all of the information the officers possessed when they applied for the arrest warrant.” Id. at 744 (citing Martinez v. City of Schenectady, 115 F.3d 111, 115 (2d Cir.1997)). While “the law does not demand that an officer applying for a warrant ‘volunteer every fact that arguably cuts against the existence of probable cause,’ ” he must “ ‘not omit circumstances that are critical’ to its evaluation.” Walczyk v. Rio, 496 F.3d 139, 161 (2d Cir.2007).
When making a determination of whether probable cause exists to support the issuance of a search warrant when the facts offered are based upon information from a confidential informant, this Court examines the “totality of the circumstances.” United States v. Smith, 9 F.3d 1007, 1012 (2d Cir.1993) (internal quotation marks omitted). “In performing this examination of the ‘totality of the circumstances’ ... the court may consider ... ‘an informant’s veracity, reliability and básis of knowledge,’ and the extent to which an informant’s statements ... are independently corroborated.” United States v. Gagnon, 373 F.3d 230, 235 (2d Cir.2004) (internal citations omitted). These considerations, however, are not an exhaustive listing of what constitutes the “totality of the circumstances.” Smith, 9 F.3d at 1012 (emphasis added).
III.
The district court determined that two material omissions from the warrant *824 application — the identity of McColley as the resident of 396 First Street and the fact that both stationary and drive — by surveillance had not led to the observation of any criminal activity — undermined the finding of probable cause. Thus, the court denied qualified immunity with respect to McColley’s Fourth Amendment claim against Riley and the state tort claims against Riley and Rensselaer.[2] This Court thus considers a “corrected affidavit” that would include these omitted facts in analyzing whether there was probable cause for the warrant to issue. Escalera, 361 F.3d at 743-44.
We begin by noting that where a warrant affidavit is based upon information provided by a confidential informant, any omissions become all the more glaring because any material omission necessarily alters the “totality of the circumstances” upon which the confidential information is to be assessed. Each omitted fact necessarily alters this totality because such review demands that courts consider the whole picture and not just the particular facts favored by the officer applying for the warrant. In the face of information that is provided by a confidential informant, each individual fact that composes the totality of the circumstances is all the more likely to be “critical” to the evaluation of probable cause. Walczyk, 496 F.3d at 161.
While it is indeed the case that where a warrant “does not report a prior conviction for a particular crime, the magistrate assumes for purposes of determining whether the government has carried its burden that no such conviction exists,” Walczyk, 496 F.3d at 161, the pertinent omission here was not merely McColley’s lack of criminal history. Rather, McColley herself was omitted entirely from the application. The issuing judge did not have the benefit of assuming that “no such conviction exist[ed]” because he was not informed that anyone other than Stink, who was the identified target of the drug investigation, resided in or maintained the first floor apartment at 396 First Street. Riley, on the other hand, fully knew that McCol-ley, an individual with no criminal history and no purported ties to the targets of the drug investigation, lived there with her child. Especially in the face of Riley’s inclusion of the identity of the residents for each of the other apartments and their present connection to the drug trade, the omission of McColley’s existence is all the more glaring. As drafted by Riley, with no mention of McColley, the warrant application makes it appear to the issuing magistrate that Stink was the only individual with custody and control of 396 First Street. If the residents of 396 First Street were properly identified, a reasonable issuing judge would have questioned the assertion that Stink had “custody and control” over the apartment. Unlike *825 Bruce’s apartment, there was no similar claim of repeated visits at 396 First Street from which knowledge of such custody could have been inferred. Including McColley’s identity in the affidavit and attendant lack of connection to Stink, Sport, Bruce, and their drug trade — either explicitly or implicitly by not describing any such history or connection — could indeed have altered an issuing magistrate’s assessment of the totality of the circumstances with respect to the Cl’s information about 396 First Street. The exact weight that the judge would have given this information remains a question of fact that prevents this Court from exercising jurisdiction over the district court’s denial of summary judgment on the claim of qualified immunity. Velardi, 40 F.3d at 574.
The other material omission from the warrant application made by Riley was that the police conducted both stationary and drive-by surveillance on 396 First Street and observed no criminal activity. As courts have recognized that independent corroboration is an aspect of the totality of the circumstances from which the credibility of a confidential informant can be assessed, Gagnon, 373 F.3d at 235, so too is information that expressly fails to corroborate a confidential informant’s account. While the police may not have been required to corroborate the Cl’s assertions, once they undertook this surveillance and observed no such criminal activity, this lack of corroboration should have been included in the warrant application. The materiality of this information is underscored by the common-sense observation that if the surveillance had yielded evidence of criminality, that information certainly would have been included in the warrant application and deemed to have been damning. The mere fact that the outcome of the surveillance was not the one the police would have preferred does not render the information immaterial.
The omission of this fact was not a failure to provide unnecessary corroboration; it was a failure to provide known information that goes directly to the credibility of the Cl. A confidential informant’s credibility is plainly relevant — even critical — to the probable cause determination, and thus the fact that surveillance provided no evidence or even suggestion of criminal activity should have been included in the warrant affidavit. Just as with the omission of McColley’s identity, the omission of the unsuccessful surveillance altered the “totality of the circumstances” under which the information provided by the Cl should have been assessed. And just as with the omission of McColley’s identity, the weight that an issuing magistrate would have given to this information is a question for the finder of fact. Velar-di, 40 F.3d at 574.
The dissent’s insistence on the existence of arguable probable cause does not alter our analysis. Arguable probable cause, a doctrine imported into this Circuit’s corrected affidavit jurisprudence in Escalera, 361 F.3d at 744; see also Opinion of Calabresi, J. at [829-30], exists if “(a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met.” Escalera, 361 F.3d at 743 (internal quotation marks omitted). The dissent conflates the questions of facts regarding the Cl’s credibility with that of whether reasonable officers could disagree as to the existence of probable cause. Questions of fact exist in this case with respect to the reliability of the Cl’s information regarding 396 First Street. Whether reasonable officers would disagree on whether there was probable cause is equally dependent on the questions of fact previously identified. If *826 the Cl’s information regarding McColley’s home was not reliable, then reasonable officers would not disagree as to the lack of probable cause. The dissent would have the doctrine of arguable probable cause swallow the entire rule of qualified immunity as well as the related limitation on our jurisdiction. This cannot be.
The information omitted from the warrant application was indeed “necessary to the finding of probable cause” because both McColley’s identity and the lack of criminal activity observed at her home go directly to the “totality of circumstances” review that underlies the assessment of probable cause based upon information provided by confidential informants. The Appellants would have this Court conclude that once information has been provided by a confidential informant who has proven reliable in the past, a warrant is necessarily supported by probable cause when based upon information from that confidential informant. This view misapprehends the “totality of circumstances” test — in assessing whether there is probable cause based upon a confidential informant’s reports, courts must look to all of the circumstances bearing upon the information’s reliability. Smith, 9 F.3d at 1012.
In this case, McColley’s identity, the fact that the Cl did not report that a woman was present in the apartment,[3] and the fact that attempts at independent corroboration via surveillance showed no sign of criminal activity are all omissions that bear upon the reliability of the overall information provided. While we share the concerns raised in the concurrence with respect to the particularly intrusive method of entry used in this case, see Opinion of Calabresi, J. at [832], issues of fact underlie the weight that the issuing judge would have given the omitted information regardless of the method of entry employed. As such, this case lies outside of the jurisdiction of this Court to perform interlocutory review of the denial of summary judgment. The issue of qualified immunity, including the question of reasonableness as to the type of warrant sought and used, is not properly before us at this stage of the proceedings.
CONCLUSION
For all of the reasons discussed above, the appeal is dismissed for a lack of jurisdiction.
CALABRESI, Circuit Judge:
Despite the fact that they reach opposite conclusions, my colleagues’ opinions both find strong support in our Court’s case law. This is because our precedents in this area are as divided as our panel.
Judge Pooler would send this case to a jury, having identified a question of fact: the weight a neutral magistrate would give to evidence omitted from Investigator Michael Riley’s warrant affidavit. The existence of such a fact question strips us of jurisdiction over this interlocutory appeal.
Judge Raggi would instead dismiss Plaintiff Ronita McColley’s Fourth Amendment claim against Riley. She would do so either because an affidavit, even without *827 the omissions, would still have established probable cause for the search of McCol-ley’s home, or, alternatively, because some reasonable people might find that such probable cause would have been established. This would, in turn, suffice to give rise to “arguable probable cause,” which, she asserts, would result in qualified immunity for Riley. This latter scenario, in which some would and others would not find probable cause on the basis of the corrected affidavit, is, of course, precisely what Judge Pooler describes as a factual dispute about the weight of the omitted evidence. But while Judge Pooler concludes that such a dispute strips us of jurisdiction, Judge Raggi sees it as a basis for granting Riley qualified immunity as a matter of law.
I write separately in part to underscore the divided precedents that give rise to this dispute. I also write, however, because I believe that the particular question to be asked in the case before us is not simply whether the warrant would have been issued, but rather whether the magistrate would have issued the precise kind of warrant Riley sought and obtained: namely, a “no-knock” warrant to be executed at any time of the day or night.[1] The question we must ask, in other words, is not just whether the facts known to Riley established probable cause to search for drugs at 396 First Street. The determinative question in the instant case is whether those facts gave rise to a reasonable suspicion that a normal, “knock-and-announce” search of McColley’s home would have been dangerous or futile, see Richards v. Wisconsin, 520 U.S. 385, 394, 117 S.Ct. 1416, 137 L.Ed.2d 615 (1997), and hence that a no-knock intrusion — which allowed police to throw a stun grenade through an apartment window, break down its door, and burst in with automatic weapons drawn — was justified in an apartment where a woman and child with no criminal history lived and where no ongoing criminal activity had been observed.
It may well be the case that, as a matter of law, the no-knock warrant Riley sought would not have issued had Riley shared all the relevant information that he knew. I am inclined to think so. But I need not go that far, however, as I conclude that there is, manifestly, at least a question of fact as to whether such a warrant would have issued. This is so because there is, at most, conflicting evidence as to whether the officers had information that the suspects were armed. Since a question of fact exists, I join Judge Pooler’s judgment that we lack jurisdiction to hear this qualified immunity appeal. In other words: because the issue of whether a warrant for an unannounced invasion of McColley’s apartment would have issued had Riley provided in his warrant affidavit all the information he had requires the resolution of factual questions, I join Judge Pooler in concluding we do not have jurisdiction, and that this case ought to be returned to the district court for a jury trial.
I.
The issue this case presents is whether a police officer should be held liable for obtaining a warrant based on an affidavit that lacked relevant information known to *828 the officer.[2] All of us agree that, to answer this question, we are to imagine a corrected affidavit which included the omitted facts and then consider whether, on the basis of such an affidavit, a magistrate would still have issued the warrant. Where my colleagues — and previous panels of this Court — part ways is on the question of whether this can be determined as a matter of law, or whether the weight a magistrate would have given the omitted information is instead a question of fact which must be decided by a jury. If it is the latter, the factual nature of the dispute would strip us of jurisdiction over this interlocutory appeal.
Troublingly, our Court’s precedents provide support for both conclusions.
A.
More than two decades ago, this Court stated that “[wjhether an item of information is material or not [to a probable cause determination] is, in the context of a motion for summary judgment, a mixed question of law and fact. The legal component depends on whether the information is relevant to a given question in light of the controlling substantive law. The factual component requires an inference as to whether the information would likely be given weight by a person considering that question.” Golino v. City of New Haven, 950 F.2d 864, 871 (2d Cir.1991) (citations omitted).[3] In Golino, we upheld then-District Court Judge Cabranes’s decision to send the probable cause determination to a jury. “The weight that a neutral magistrate would likely have given the [omitted or misrepresented] information,” we said, “is not a legal question but rather is a question to be resolved by the finder of fact.” Id. at 872.
In Velardi v. Walsh, 40 F.3d 569 (2d Cir.1994), we explained further that applying the corrected affidavit doctrine does not involve “reviewing] a magistrate’s pri- or determination of probable cause, but rather try[ing] to predict whether a magistrate would have found probable cause if he had been presented with truthful information.” Id. at 574 n. 1. Since “the weight that a neutral magistrate would likely have given such information is a question for the finder of fact,” we held that “summary judgment is inappropriate in doubtful cases.” Id. at 574.[4]
We have restated this holding recently. See Southerland v. City of New York, 680 F.3d 127, 144 (2d Cir.2012). As the Southerland Court said, quoting an earlier opinion by Judge Raggi: “[A] court may grant summary judgment to a defendant based on qualified immunity only z/‘the evidence, *829 viewed in the light most favorable to the plaintiffs, discloses no genuine dispute that a magistrate would have issued the warrant on the basis of the corrected affidavits.’ ” Southerland, 680 F.3d at 144 (quoting Walezyk v. Rio, 496 F.3d 139, 158 (2d Cir.2007)) (emphasis added).
B.
Alongside these cases, however, runs another line of precedents that treat determinations of probable cause as questions of law, to be made by the court rather than a jury. For example, in Cartier v. Lussier, 955 F.2d 841, 845 (2d Cir.1992), we said that “after the affidavit ha[d] been corrected in a light most favorable to the plaintiffs, the district court should then have determined whether as a matter of law it did or did not support probable cause.” Qualified immunity should be granted at the summary judgment stage, Cartier instructed, “if the affidavit accompanying the warrant is sufficient, after correcting for material misstatements or omissions, to support a reasonable officer’s belief that probable cause existed.”[5] Id. (internal quotation marks omitted).
This standard was quoted, and restated, in Escalera v. Lunn, 361 F.3d 737, 743-44 (2d Cir.2004). As Judge Raggi notes, Dissenting Op., post at 838, Escalera held that “summary judgment should be granted to the defendant on the basis of qualified immunity” whenever a corrected affidavit provides “an objective basis to support arguable probable cause.”[6] We wrote there — optimistically, I believe — “Our case law is clear,” that when considering a qualified immunity claim, “ ‘a court should put aside allegedly false material, supply any omitted information, and then determine whether the contents of the ‘corrected affidavit’ would have supported a finding of [arguable] probable cause.” Id. (quoting Martinez v. City of Schenectady, 115 F.3d 111, 115 (2d Cir.1997)). Notably, the bracketed addition — “[arguable]”—was Es-calera ’s. The case it quoted, Martinez (like the case Martinez itself quoted, Soares v. Connecticut, 8 F.3d 917, 920 (2d Cir.1993)), had, instead, instructed courts to “determine whether the contents of the ‘corrected affidavit’ would have supported a finding of probable cause” — not arguable probable cause. Escalera is important, therefore, for having first made “arguable probable cause” part of the corrected affidavits doctrine in our Circuit.
Judge Raggi’s opinion for the Court in Walezyk v. Rio followed Escalera in this regard, observing that while probable cause for one of the searches at issue in that case was lacking, due to stale information in the warrant affidavit, “defendants might still be entitled to claim qualified immunity from liability for damages if the *830 search was supported by ‘arguable probable cause.’ ” 496 F.3d at 163. Notably, however, in Walczyk, the Court found that arguable probable cause might obtain not because of some hypothetical disagreement among reasonable officers about probable cause, but rather because it was unclear which of the defendants in that case knew or should have known that the information in their affidavit was stale. See Walczyk, 496 F.3d at 163.
This understanding of arguable probable cause is an eminently sensible one. But it is not the understanding used in Escalera, and it is not the understanding Judge Rag-gi employs in her opinion in the case now before us. In these two instances, unlike in Walczyk, arguable probable cause is not used to shield officers who may have been unaware of whatever evidence negated probable cause. Instead, here, arguable probable cause is made to encompass warrant affidavits which, though unable to establish probable cause, can be excused as “close enough for government work.” This, I take it, is what Judge Raggi means in the instant case when she asserts that, even if probable cause is not established by the corrected affidavit, arguable probable cause still obtains because “officers of reasonable competence could disagree” as to whether the probable cause test was met. Dissenting Op., post at 851 (quoting Escalera, 361 F.3d at 743). Or, to put it still more generously for qualified immunity: arguable probable cause obtains whenever it would not have been “plainly incompetent” for an officer to find probable cause on the basis of the corrected affidavit. Id. at 846 (quoting Malley v. Briggs, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)).[7]
By distinguishing this from the other understanding of arguable probable cause, I do not mean to suggest that the understanding of probable cause that Judge Raggi employs in the present case lacks precedential support. In fact, it can be derived from Golino’s two-pronged description of qualified immunity, which protects officers if “either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met.” 950 F.2d at 870 (citing Malley, 475 U.S. at 341, 106 S.Ct. 1092). Walczyk turned on the “objectively reasonable” prong; Escal-era and this ease both implicate the “rea *831 sonable disagreement” prong. The latter adds, however, a nimbus of protection around probable cause, which allows officers to make objectively unreasonable probable cause determinations so long as the officers themselves are reasonably competent.
To be clear: my objection to Judge Rag-gi’s understanding of arguable probable cause is not that it lacks precedential support. Rather, the ample support it has cannot be reconciled with the equally extensive precedents cited in Judge Pooler’s opinion. It is to this conflict that I now turn.
C.
If corrected affidavits always established, or failed to establish, probable cause so clearly that no reasonable judge or juror could find otherwise, our Court’s precedents would cause no confusion. The confusion arises in the middle: in cases where some reasonable judges or jurors would, and others would not, find probable cause on the basis of the corrected affidavit. To put it another way, confusion arises when reasonable people disagree about the weight a magistrate would give the corrected affidavit.
Importantly, these two formulations describe the same underlying questions. Disagreements about whether a corrected affidavit establishes probable cause are identical to disputes over how much weight a magistrate would have given to the omitted evidence. Such evidence, after all, is deemed weighty enough to be material only if it would have altered the magistrate’s probable cause determination. But this can only be decided by asking whether probable cause actually remains once the evidence is considered. To call the question of weight a genuine question of fact is merely to say that reasonable people could disagree about whether probable cause would still obtain.
And therein lies the problem. On the one hand, some of our cases do say that determining the weight a magistrate would give omitted evidence is a question of fact. And that question eludes summary judgment if, but only if, reasonable factfinders could disagree about the answer — that is, about whether probable cause would still be found. Yet, if reasonable people disagree about the existence of probable cause, then arguable probable cause has, by definition, been established under others of our cases! Since arguable probable cause exists whenever reasonable people disagree about the existence of actual probable cause, no case of this sort should ever go to a jury. Either a court will decide probable cause (one way or the other) as a matter of law, or the court will find that probable cause is open to reasonable dispute and will on that basis dismiss the case, again as a matter of law, on qualified immunity grounds. But, to continue around the circle of our cases, this, of course, conflicts with the clear holding of Velardi that “doubtful cases” must be sent to a jury. 40 F.3d at 574.
Judge Raggi is well aware of Velardi’s holding; she refers to it, in fact, both in Walczyk, see 496 F.3d at 158, and her opinion here, Dissenting Op., post at 839 (“To the extent Velardi observed that the weight a judicial officer would give omitted information is a question of fact, disputes as to that question might require a jury trial in ‘doubtful cases’ of probable cause.... ”).[8] She does not explain, how *832 ever, how “doubtful cases of probable cause” can ever be anything other than “cases of arguable probable cause.” It would follow that in such circumstances, unless defendants somehow fail to raise a qualified immunity defense, a jury trial would never be required.
By identifying, as I believe I have, this conflict in our cases, I do not mean to suggest that one side, rather than the other, is the “correct” one. It is only to say that we are dealing with two confusing, and at times confused, lines of cases. Our Court would do well to provide clarity in this area. But the task is not an easy one, and, in any event, this case does not require us — and thus does not allow us — to undertake it. We need not resolve the tension I have described because the only question this case requires us to confront — whether the particular warrant that was granted still would have issued had the affidavit been more complete — can be easily answered, I believe, under either line of our case law.
II.
Although my colleagues disagree about whether the information Riley omitted from his affidavit might have changed a magistrate’s mind about the existence of probable cause to search McColley’s apartment for drugs, the question in this case, and hence in their dispute, is whether Riley violated McColley’s Fourth Amendment right to be free from unreasonable searches and seizures. Significantly, our Court has said that “[t]he method of an officer’s entry into a dwelling is among the factors to be considered in assessing the reasonableness of a search under the Fourth Amendment.” United States v. Tisdale, 195 F.3d 70, 72 (2d Cir.1999) (per curiam) (emphasis added).
Here, the method of entry was more akin to a military invasion than the knocking and entering envisioned, and generally required, by our law. See Wilson v. Arkansas, 514 U.S. 927, 931-32, 115 S.Ct. 1914, 131 L.Ed.2d 976 (1995). As Judge Pooler describes in her opinion, members of Troy’s Emergency Response Team, at six o’clock one morning, shattered the window of McColley’s living room and threw a flash-bang grenade inside before breaking down the door and storming in, brandishing automatic wearing only a t-shirt and underwear when the officers burst in. Thus attired, she was handcuffed and forced to lie face-down on her bed while an officer guarded her, weapon drawn, and a dog searched her room. By the time the police had left — having discovered only an electric bill and McColley’s college course schedule — McColley’s furniture had been overturned, her rug and wall bore burn marks, her bookshelf, window, and doors had been broken, and her toiletries and clothes, along with her daughter’s, had been strewn across the floor.
The trauma caused by a search of this sort was well described by a unanimous Supreme Court in Richards v. Wisconsin:
While it is true that a no-knock entry is less intrusive than, for example, a war-rantless search, the individual interests implicated by an unannounced, forcible entry should not be unduly minimized .... [T]he common law recognized that individuals should be provided the opportunity to comply with the law and to avoid the destruction of property oc *833 casioned by a forcible entry. These interests are not inconsequential. Additionally, when police enter a residence without announcing their presence, the residents are not given any opportunity to prepare themselves for such an entry. ... The brief interlude between announcement and entry with a warrant may be the opportunity that an individual has to pull on clothes or get out of bed.
520 U.S. at 393 n. 5, 117 S.Ct. 1416 (citations omitted).
Because no-knock searches impinge so seriously upon both privacy and property interests, they are justified only if police “have a reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous or futile, or that it would inhibit the effective investigation of the crime by, for example, allowing the destruction of evidence.”[9] Id. at 394, 117 S.Ct. 1416; Tisdale, 195 F.3d at 72. In Richards, the Supreme Court specifically disallowed blanket exceptions to the common law knock-and-announce requirement; in particular, the Court struck down the Wisconsin Supreme Court’s rule “that police officers are never required to knock and announce their presence when executing a search warrant in a felony drug investigation.” Id. at 387-88, 117 S.Ct. 1416 (emphasis in original).
In his application to search McColley’s apartment, Riley requested a warrant that could be “executed at any time of the day or night” and that authorized officers “to enter the premises to be searched without giving notice of his [sic] authority and purpose.” J.A. 188. These requests were based on (what Riley described as) his reasonable cause to believe (1) that “[t]he property sought may be easily and quickly destroyed or disposed of’ and (2) that giving notice “may endanger the life or safety of the executing Police Officers.” Id. According to Riley’s affidavit, these beliefs were based on “the physical properties of [the] contraband”; the “common practice of persons who are involved in the illicit use and trafficking of controlled substances to attempt to remove, destroy or dispose of said controlled substances if notice ... is given”; and Riley’s personal experience that giving notice allows suspects “time to prepare themselves,” thereby endangering officers’ safety. Id.
In addition to this boilerplate, Riley included in his application that 396 First Street was under the custody and control of “Stink,” a drug dealer and “soldier” for another dealer, “Chuck.” “Stink” was also said to sell marijuana and crack cocaine out of 396 First Street. Although Riley described the residents of the other apartments for which he obtained a search warrant, he failed to tell the magistrate that McColley and her then four-year-old daughter lived at 396 First Street. And although Riley described the female resident of another targeted apartment as someone who “deals approximately one hundred grams of marijuana a week,” J.A. 177, he did not tell the magistrate that the known residents of 396 First Street had no criminal history. Riley, finally, failed to tell the magistrate that police surveillance had failed to observe any criminal activity at all during surveillance of McColley’s apartment carried out over the course of three days.
Each of these omissions is legally relevant, and highly so, to the decision of *834 whether to issue a no-knock warrant. Given that the apartment to be searched was home to a woman and child with no criminal record and, moreover, did not appear to be a hub of ongoing criminal activity, it would certainly seem possible for the search to have been “conducted at a time when the only individuals present in a residence ha[d] no connection with the drug activity and thus [would] be unlikely to threaten officers or destroy evidence.” Richards, 520 U.S. at 393, 117 S.Ct. 1416. Riley’s justification for the inactivity at McColley’s apartment — his stated belief that it was a “stash house,” J.A. 312 — itself weighed against the no-knock warrant, since large quantities of stashed narcotics would be difficult to dispose of quickly. See id. (“The police could know that the drugs being searched for were of a type or in a location that made them impossible to destroy quickly.”). As the Richards Court said of such situations, “the asserted governmental interests in preserving evidence and maintaining safety may not outweigh the individual privacy interests intruded upon by a no-knock entry.” Id.
Judge Raggi’s argument, in her dissent, that the “readily disposable form” of the drugs “in zip-loc baggies,” Dissenting Op., post at 848, justified the no-knock warrant therefore not only goes a long way toward creating the kind of blanket justification for no-knock searches in narcotics investigations that the Supreme Court specifically disapproved of in Richards — for when are drugs, by their nature compact in size, not in small packages? — but it also ignores the record evidence that it was in this case quite unlikely that all of the drugs could have been disposed of had a knock-and-announce warrant been issued. That evidence includes the very fact that 396 First Street was allegedly a “stash” house (which Officer Riley defined generally as a location where the traffickers “would keep money, drugs, and weapons,” J.A. 312); that the Cl’s recollection was that 7 grams of cocaine were being cut with a playing card in open view on an ironing board at 396 First Street; that 100 grams or more of marijuana were allegedly being sold each week from at least one of the residences; and that every time the Cl had visited the apartments, “Stink” had made crack cocaine sales. Evidence like this shows that narcotics were out in the open, and that enough drugs were present (given the fact that they were “stashfed]” there, J.A. 312) to make it most unlikely that the time it takes to knock and announce would be so harmful to the finding of drugs as to justify an unannounced military-style invasion.
In light of the facts known to Riley when he submitted his warrant affidavit, it therefore appears possible, as a matter of law, that the governmental interests Riley asserted here did not outweigh the privacy and property interests his no-knock entry infringed. If police were able to invade the quiet home of a law-abiding woman and her child without knocking and identifying themselves, simply because they believed that the home contained drugs, then it is unclear when the police could ever not enter unannounced, at least when drugs were being investigated. Yet we know from Richards that blanket exceptions to the knock-and-announce requirement are unconstitutional, even in regard to drug searches. To search without first knocking, the government must reasonably suspect that something more than drugs awaits inside. A woman with no known criminal ties and her small child hardly strike me as that “something more.”
III.
Thus far, I have argued that each potential argument supporting a “no-knock warrant” was lacking, because there was no *835 convincing record evidence that the drugs, sold daily and warehoused in the residence, were easily disposable and because there would be no reason to believe that a mother and a child with no criminal record posed a danger justifying a “no-knock” warrant. However, one remaining argument requires special consideration.
Judge Raggi asserts that a corrected affidavit would support a reasonable suspicion of danger — and therefore justify a no-knock warrant — based on the officers’ belief that Sport, Stink, and Chuck might have been present and armed at 396 First Street. See Dissenting Op., post at 848-49. Judge Raggi admits that the original affidavit only included as justification for a no-knock warrant Riley’s general knowledge that drug dealers often possess firearms — precisely the kind of general knowledge that, the Supreme Court has told us, cannot support a no-knock warrant. See Richards, 520 U.S. at 387-88, 117 S.Ct. 1416. She then, however, expands the universe to be considered and, based on other record evidence, concludes that a corrected affidavit would indicate, from the Cl’s communications, “case-specific” knowledge that “Sport, Stink, and Chuck all had access to and possession of firearms.” Dissenting Op., post at 849.[10]t On this basis, Judge Raggi determines' that the more specific requirement that the Supreme Court has held was needed to justify a no-knock intrusion would be present in a corrected affidavit. Judge Raggi rightly does not contend that the officers gleaned this information from the written “voluntary statement” of the Cl, but instead from an “operational plan” drafted by Riley, in which he makes passing reference to the notion that the traffickers had access to firearms. See id. at 849.
Significantly, however, in testimony Riley makes no such assertion that he believed there would be armed persons at 396 First Street. When asked in his deposition whether there was anything that made him think in particular that there would be weapons in this apartment, Riley responded, “Nothing specific.” J.A. 411. He then went on to explain — as he had in the operational plan — that the confidential informant knew some of the persons involved in the drug trade here to possess firearms. Id.
But the record then becomes more complicated: for even this statement by Riley is contradicted. During Officer Rosney’s deposition, he said that the officers had no “specific information from the [confidential] informant that [the persons within the residences] were armed.” J.A. 259. He attributed the officers’ belief that Sport, Stink, and Chuck may have been armed to the fact that 396 First Street was a “stash house” which made the officers therefore think that the persons within it “would be armed and dangerous” (i.e., based on the kind of generic data held to be insufficient by the Supreme Court!). J.A. 140.
*836 The record evidence is therefore mixed on the key- — and for me, fundamental— question of whether or not the officers had a general or specific belief that Sport, Stink, and Chuck had firearms, and therefore whether knocking and announcing would have been dangerous. This is a constitutionally-determinative issue, precisely because, as the Court explained in Richards, a general belief that drug traffickers are armed because drug traffickers typically are armed cannot support a no-knock warrant. See 520 U.S. at 394, 117 S.Ct. 1416. Just what the officers knew therefore becomes a critical question of fact. Whether they had, as Rosney says, only a general belief that the persons would be armed simply because they were involved in narcotics trade or whether they had, as Riley says, a particularized belief based on the confidential informant’s statements or other evidence, is crucial and cannot be concluded as a matter of law based on the record before us.
I therefore think there is a critical issue of material fact for the jury and that we must return the case to the district court on that ground. That said, I want to make clear that it may well be the case, even apart from the factual dispute, that the officers would have had no reason to think that these drug traffickers — even if they had access to firearms — would be at McColley’s residence armed in the wee hours of the morning. There may have been, in short, no particular — or, to use Riley’s word, “specific” — reason to suspect that knocking and announcing at the home of a mother without a criminal record in the early morning hours, when it would be likely that “the only individuals present in [the] residence have no connection with the drug activity,” Richards, 520 U.S. at 393, 117 S.Ct. 1416, would have been dangerous. In light of this and the other circumstances suggesting that a military-like invasion into a the home of a mother without a criminal record was unjustified, one could reasonably be disposed to conclude as a matter of law, regardless of how the factual dispute about firearms is resolved, that a magistrate would not have properly issued a “no-knock” warrant for the search of McColley’s apartment, and on that basis one might be well inclined to affirm the district court’s denial of Riley’s motion for summary judgment.
But we need not, and hence should not, go that far. In light of the fact that there is conflicting evidence on whether the officers had a particularized belief — as against only the generalized conjecture that drug traffickers typically have firearms — that Sport, Stink, and Chuck were armed, there is indisputably a question of fact on an important issue. And that question precludes summary judgment and deprives us of jurisdiction over this interlocutory appeal.
This conclusion, moreover, seems to me to be required even under Judge Raggi’s more capacious standard of “arguable reasonable suspicion.” See Escalera, 361 F.3d at 743. That is, the question of fact as to whether the officers had a particularized belief that the drug traffickers were likely to be armed bears directly upon whether the officers could have held an “objectively reasonable” belief they would be in danger if they knocked and announced at 396 First Street. See id.; see also Holeman v. City of New London, 425 F.3d 184, 191 (2d Cir.2005). We cannot here decide what, under the Supreme Court’s standard, the officers reasonably suspected until we resolve the essentially and unavoidably factual conflict reflected in their inconsistent statements as to whether or not they thought the drug traffickers had firearms and would be armed. Because there is a “dispute as to what facts [the officers] relied on,” Walczyk, 496 F.3d at 157, we cannot conclude “as a *837 matter of law, that [a] corrected affidavit would have been sufficient,” Smith, 175 F.3d at 105-106 n. 5, to support a no-knock warrant. And this is so regardless of whether one follows Judge Raggi’s or Judge Pooler’s line of cases as to “arguable” probable cause; indeed, it must be resolved before we can find that reasonable suspicion existed.
This disputed and material question of fact is enough for me to conclude that summary judgment was inappropriate under either line of this Circuit’s cases and, therefore, to join Judge Pooler’s holding that we have no jurisdiction over the issue of qualified immunity at this time, and that this case must return to the district court for further proceedings, and possibly proceed to trial.

. The Cl had actually only made four previous controlled buys for the Task Force. McColley points to this discrepancy as undermining that validity of the warrant, but, as the district court concluded, this was not a material error.

. McColley argued that Riley made five omissions from the warrant application that were material and thus undermined the finding of probable cause: (1) errors as to the date the Cl went to 396 First Street and the date Riley learned about this trip; (2) an assertion that the Cl had accurately identified all of the addresses at issue, when in fact he gave the address at Sixth and Glenn instead of 17 101st Street; (3) a claim that the Cl had made five controlled buys, when in fact the Cl had made four previous controlled buys and one controlled buy in the instant case; (4) omission of the identity and criminal history of McColley; and (5) omission of the fact that surveillance of 396 First Street did not indicate any criminal activity. As to the other purported omissions, the district court determined that reliance on these to disturb the finding of probable cause' would be just the sort of "hypertechnical” reading of the warrant that has been cautioned against. See United States v. Ventresca, 380 U.S. 102, 109, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965). We do not disturb that analysis here.

. Rensselaer and Riley now assert that the Cl did indeed report the presence of a woman at the apartment. This assertion arose for the first time at Riley’s deposition, however, the contemporaneous materials — the two voluntary statements submitted by the Cl and the affidavit submitted by Riley to the court issuing the warrant — include no such claim. It is notable that such a potentially critical fact, one that could have supported a claimed link between McColley and the drug trade, was not proffered until the heat of litigation. As this Court must consider the facts in the light most favorable to the plaintiff, we do not credit this late assertion.

. As I explaindn Part II, because of the privacy and property interests implicated in no-knock searches, the Supreme Court has held that they are only justified when the police "have a reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous or futile, or that it would inhibit the effective investigation of the crime by, for example, allowing the destruction of evidence.” Richards v. Wisconsin, 520 U.S. 385, 394, 117 S.Ct. 1416, 137 L.Ed.2d 615 (1997).

. My colleagues dispute whether a general warrant could issue. As indicated above, I believe that the more germane question to be whether a no-lcnock warrant — the kind of warrant that was actually issued in this case— was justified.

. Importantly, we have jurisdiction over an interlocutory order denying qualified immunity only where the questions to be determined are legal, rather than factual. See, e.g., Locur-to v. Safir, 264 F.3d 154, 163 (2d Cir.2001); Johnson v. Jones, 515 U.S. 304, 314, 319-20, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995); accord Rodriguez v. Phillips, 66 F.3d 470, 475 (2d Cir.1995).

.This, of course, left room for cases which were not doubtful. A factual dispute might be so lopsided that it could be decided as a matter of law, as Velardi recognized. See id. ("[I]f the evidence, viewed in the light most favorable to the plaintiffs, discloses no genuine dispute that a magistrate would have issued the warrant on the basis of the ‘corrected affidavits,’ then under the ordinary standard for summary judgment, a qualified immunity defense must be upheld.” (citation omitted)). Judge Raggi — in her first ground for decision — indicates that she thinks that this is just such a lopsided case. See Dissenting Op., post at 838-45.

. Cartier's instruction was cited in Smith v. Edwards, 175 F.3d 99 (2d Cir.1999) (Sotoma-yor, J.), which called for courts, in material omission cases, first to correct the warrant affidavit and "then determine whether as a matter of law the corrected affidavit did or did not support probable cause.” Id. at 105 (quotation marks and brackets omitted). Smith is ambiguous, however, as to whether probable cause can always be determined as a matter of law once the facts in a corrected affidavit are stipulated; the case could instead be read to mean no more than that courts should employ the ordinary summary judgment test in regard to the corrected affidavit, and ask whether all reasonable factfinders would come out the same way on the question of probable cause.

. Quoting Golino, Escalera says that "arguable probable cause” exists “ ‘if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met.’ ” Escalera, 361 F.3d at 743 (quoting Golino, 950 F.2d at 870).

. Then-Judge Sotomayor took issue with this understanding of arguable probable cause in her concurring opinion in Walczyk. As she explained:
Whether reasonably competent officers could disagree about the lawfulness of the conduct at issue, however, is not the same question the Supreme Court has repeatedly instructed us to consider: whether it would be clear to a reasonable officer that his or her conduct was unlawful in the situation he or she confronted.... [0]ur requirement of consensus among all reasonable officers departs from Supreme Court dictates and unjustifiably raises the bar to liability for violations of constitutional rights.
Asking whether "officers of reasonable competence could disagree” shifts this inquiry subtly but significantly. Instead of asking whether the defendant's conduct was beyond the threshold of permissible error, as the reasonable officer standard does, this inquiry affords a defendant immunity unless a court is confident that a range of hypothetical reasonably competent officers could not disagree as to whether the defendant's conduct was lawful. This standard is not only more permissive of defendants seeking to justify their conduct; it also takes courts outside their traditional domain, asking them to speculate as to the range of views that reasonable law enforcement officers might hold, rather than engaging in the objective reasonableness determination that courts are well-equipped to make.
496 F.3d at 169-70 (Sotomayor, J., concurring) (quotation marks, citations, and alterations omitted).

. In the preceding sentence, Judge Raggi states, citing Walczyk, 496 F.3d at 157, that "the existence of probable cause is generally a matter of law for the court.” Dissenting Op., post at 839 (citing Walczyk, 496 F.3d at 157) (emphasis added). "Generally” here would *832 seem to suggest that sometimes, at least' — - presumably in those "doubtful cases” mentioned in the next sentence — a jury might be needed. But what Judge Raggi does not acknowledge, even as she cites Velardi, is that her notion of arguable probable cause swallows all such doubtful cases, ensuring that Velardi’s promise — sometimes—of a jury trial will in fact never be realized.

. We note that, as Judge Raggi states in her dissent, the police need only reasonable suspicion, and not probable cause, that knocking and announcing would be dangerous or futile. As we will demonstrate below, there exists an issue of fact that must be resolved before even this standard is met.

. I do not here dispute Judge Raggi's trek into the record. It is worth noting that in Walczyk, Judge Raggi and the panel were comfortable deciding the issue of probable cause as a matter of law because they could do so on the face of the affidavits. See 496 F.3d at 157 ("In this case, there can be no dispute as to what facts the defendants relied on to establish probable cause for the challenged arrest and searches; they are memorialized in warrant affidavits. Thus, whether the affidavits, on their face, demonstrate probable cause, is a question of law.”). Here, the affidavit does not include information about the traffickers being armed, on its face or otherwise, and Judge Raggi’s foray into the record in a quest to decide the issue as a matter of law seems to stretch beyond the bounds of Walczyk. Indeed, here it is both the case that the fact cannot be gleaned from the affidavit and that the fact is disputed by the officers themselves, as I explore below, which makes deciding it as a matter of law all the more troubling ... to put it mildly.