16-1463-cv
*Ganek v. Leibowitz*

# In the
# United States Court of Appeals
## for the Second Circuit

AUGUST TERM 2016

No. 16-1463-cv

DAVID GANEK,
*Plaintiff-Appellee,*

v.

DAVID LEIBOWITZ, REED BRODSKY, DAVID MAKOL, MATT KOMAR,
JAMES HINKLE, HOLLY J. TRASK, DAVID CHAVES, PATRICK CARROLL,
RACHEL ROJAS, DIEGO RODRIGUEZ, MARC P. BERGER, CHRISTOPHER L.
GARCIA, RICHARD B. ZABEL, BOYD M. JOHNSON, III, PREETINDER S.
BHARARA,
*Defendants-Appellants.*

On Appeal from the United States District Court
for the Southern District of New York

ARGUED: MARCH 24, 2017
DECIDED: OCTOBER 17, 2017

Before: RAGGI, CHIN, CARNEY, *Circuit Judges*.

---

On appeal from an order entered in the United States District Court for the Southern District of New York (Pauley, *J.*), the defendants, all federal law enforcement authorities, argue that they were wrongfully denied qualified immunity and, therefore, dismissal of all plaintiffs' claims for money damages pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), based on alleged Fourth and Fifth Amendment violations in procuring and executing a search warrant.

REVERSED AND REMANDED.

---

SARAH S. NORMAND, Assistant United States Attorney (Andrew E. Krause, Jeffrey S. Oestericher, Assistant United States Attorneys, *on the brief*), *for* Joon H. Kim, Acting United States Attorney for the Southern District of New York, New York, New York, *for Defendants-Appellants*.

NANCY GERTNER (Anna Benvenutti Hoffmann, Barry Scheck, Nick Brustin, Farhang Heydari, Alexandra Lampert, Rick Sawyer, *on the brief*), Neufeld Scheck &

Brustin, LLP, New York, New York, *for Plaintiff-Appellee*.

Joshua L. Dratel, Law Offices of Joshua L. Dratel, P.C., New York, New York; John W. Keker, Brook Dooley, Keker & Van Nest LLP, San Francisco, California, *for Amicus Curiae* National Association of Criminal Defense Lawyers.

––––––––––

REENA RAGGI, *Circuit Judge*:

In this *Bivens* action, plaintiff David Ganek, a co-founding partner of investment fund Level Global Investors ("LG"), sues the named agents of the Federal Bureau of Investigation ("FBI") and federal prosecutors in the United States Attorney's Office for the Southern District of New York ("SDNY") for alleged violations of his Fourth and Fifth Amendment rights in procuring and executing a federal search warrant at LG's Manhattan offices on November 22, 2010. *See Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971). Defendants now appeal from an order of the United States District Court for the Southern District of New York (William H. Pauley III, *Judge*), denying their motion for qualified immunity and, therefore, for dismissal of the entirety of Ganek's complaint. *See Ganek v. Leibowitz*, 167 F. Supp. 3d 623 (S.D.N.Y. 2016). Our jurisdiction to review this ruling under 28 U.S.C. § 1291 is undisputed. *See Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985) (holding that denial of qualified immunity, "to the extent that it turns on an issue of law, is an appealable 'final decision' within the meaning of 28 U.S.C. § 1291"); *accord Ashcroft v. Iqbal*, 556 U.S.

662, 672 (2009). For the reasons stated in this opinion, we conclude that defendants are entitled to qualified immunity and, accordingly, we reverse the district court's challenged order and direct the dismissal of all Ganek's outstanding claims.

## BACKGROUND

### I. The LG Search

The following facts are drawn from Ganek's complaint and must be credited on this appeal.

### A. Sam Adondakis Admits Receiving and Communicating Inside Information to Persons at LG

David Ganek and Anthony Chiasson co-founded investment fund LG, with Ganek serving as LG's principal partner until the fund's closure in 2011. In 2010, LG's offices were located on the 27th floor of 888 Seventh Avenue in Manhattan, and the fund had approximately $4 billion under management.

From 2006 until 2010, Spyridon "Sam" Adondakis was employed by LG as a research analyst, with a particular focus on the technology industry. Adondakis was asked to leave LG in May 2010 when it was determined that he had violated the fund's internal compliance protocols.

On October 14, 2010, FBI defendants Hinkle and Makol confronted Adondakis with wiretap evidence collected from third parties, which implicated Adondakis in insider trading while at LG. Sometime thereafter, Adondakis agreed to cooperate with government authorities and, on November 2, 2010, he met with defendants Assistant United States Attorneys ("AUSAs") Brodsky

4

and Leibowitz as well as FBI defendants Hinkle, Makol, and Komar. At that meeting, Adondakis admitted to having knowingly received sensitive, non-public information from various insiders and to having passed on that information to persons at LG, including Ganek, Chiasson, and another LG employee, Greg Brenner.[1] All three persons referenced by Adondakis in fact used the information conveyed to them to make trading decisions. But whereas Adondakis told defendants that he specifically advised Chiasson and Brenner that the information conveyed came from an inside source, Adondakis "never" said he so advised Ganek. J.A. 36, ¶ 86. To the contrary, Adondakis told defendants that "he had *never* told Mr. Ganek the source of the information he provided." *Id.* (emphasis in original).

### B. The LG Search Warrant

On November 21, 2010, FBI defendant Trask applied to an SDNY Magistrate Judge for a warrant to search certain areas within LG, including Ganek's, Chiasson's, and Brenner's offices; desktop and laptop computers used by Adondakis while employed at LG; and LG's investors' servers. In support, Trask submitted a signed affidavit that contains the alleged misrepresentation at the heart of this case, *i.e.*, that "ADONDAKIS informed GANEK . . . of the sources of the Inside Information" provided to him. J.A. 98, ¶ 13.c;

---

[1] While defendants have redacted Brenner's name from their filings in this case, referring only to a "Third Person," the complaint identifies that third person as Brenner. *See* J.A. 48, ¶ 143.

*see id.* at 99, ¶ 13.e (same).[2]  Trask professed to have obtained this information from FBI colleagues.

The magistrate judge authorized the requested search warrant, which was executed at LG the following day, November 22, 2010.  In the course of doing so, FBI agents and/or SDNY AUSAs searched Ganek's office, files, and electronic devices, and made an electronic copy of the contents of his personal cellphone.  Defendants provided advance notice of the LG search to the *Wall Street Journal*, which took and published photographs of FBI agents carrying boxes out of LG.

### C.   Defendants' Post-Search Assurances

Ganek feared that media reports about the LG search and attending federal investigation into insider trading would prompt

---

[2] We here place the misstatement in the two contexts where it appears in the Trask affidavit:

> During his work as an analyst at [LG], ADONDAKIS obtained Inside Information from insiders at public companies . . .[,] provided this Inside Information to DAVID GANEK, ANTHONY CHIASSON, and [Third Person], and GANEK, CHIASSON, and [Third Person] executed and caused others to execute certain securities transactions based, in part, on the Inside Information, and . . . *ADONDAKIS informed GANEK*, CHIASSON, and [Third Person] *of the sources of the Inside Information*."

J.A. 98, ¶ 13.c (emphasis added).

> During his work as an analyst at [LG], ADONDAKIS spoke with and provided Inside Information to GANEK, CHIASSON, and [Third Person], and *informed GANEK*, CHIASSON, and [Third Person] *regarding the sources of the Inside Information.*

*Id.* at 99, ¶ 13.e (emphasis added).

6

LG investors to divest from the fund. Accordingly, on December 20, 2010, LG representatives met with AUSA defendants Zabel and Leibowitz, in the course of which meeting defendants stated that the LG search "had been carefully considered at the highest levels, with full appreciation for the likely commercial consequences, and . . . that all necessary precautions had been taken." J.A. 41, ¶ 110. Some months later, on February 4, 2011, an LG attorney contacted defendant U.S. Attorney Bharara to ask that he publicly clarify that "Mr. Ganek was not a target of the investigation or that the search warrant did not allege probable cause that Mr. Ganek had engaged in insider trading." *Id.* at 43–44, ¶ 121. Bharara declined, asserting that his office had not pursued the LG search "without thinking through the consequences of doing so." *Id.* at 44, ¶ 123.

### D. Reiteration of the Misrepresentation and Further Adondakis Interview

At and about this same time, on February 3, 2011, one of the FBI defendants drafted a report of the November 2 meeting that repeated the misstatement contained in the Trask affidavit, *i.e.*, that Adondakis had told defendants that he had advised Ganek of the inside source of the information conveyed to him, specifically, that it "came directly from contacts at Dell." J.A. 42, ¶ 111.

Later that month, defendants again met with Adondakis, who "reiterated that he had never told Mr. Ganek anything about the source of his information." *Id.* at 45, ¶ 130.

Meanwhile, on February 11, 2011, approximately three months after the LG search, Ganek announced that, due to the flight of investors from LG, he was forced to close the fund.

7

## E.     Indictments and Disclosure of the Trask Affidavit

Adondakis was indicted for insider trading on April 25, 2011, but his indictment was not unsealed until January 18, 2012, the same day on which Bharara announced the indictment of Chiasson, among others, for insider trading.  Ganek was never indicted.

On March 1, 2012, the district court issued a protective order permitting certain documents, including those supporting the LG search, to be disclosed to defendants and other specified categories of persons, which ultimately included Ganek's counsel.

Chiasson stood trial in the fall of 2012, and was found guilty of conspiratorial and substantive securities fraud based on his insider trading.[3]  Testifying as a prosecution witness, Adondakis acknowledged telling Chiasson and Brenner that the information he passed on to them came from an inside source, but suggested that he had not so told Ganek.  In his trial testimony, FBI defendant Makol also stated that Adondakis had not told defendants that he informed Ganek of the inside source for information communicated to him.

---

[3] Chiasson's conviction was later vacated based on this court's decision in *United States v. Newman*, 773 F.3d 438 (2d Cir. 2014), which has since been abrogated in part by *Salman v. United States*, 137 S. Ct. 420 (2016).  Meanwhile, Adondakis pleaded guilty to insider trading but, after *Newman*, the government sought and obtained a *nolle prosequi* order.  These legal developments, occurring after the events here at issue, are irrelevant to resolution of this appeal because qualified immunity must be assessed in light of the legal rules in place at the time of the action in question.  *See Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012).

## II.    The Instant Action

Ganek filed this action on February 26, 2015, pleading Fourth and Fifth Amendment claims against defendants Trask, Makol, Hinkle, Komar, Brodsky, and Leibowitz; a failure-to-intercede claim against all defendants; and a claim for supervisory liability against defendants Bharara, Johnson, Zabel, Garcia, Berger, Rodriguez, Rojas, Chaves, and Carroll.  He seeks damages for the loss of his business, which had been valued at $400 million, as well as for lost income and lost business reputation.

Defendants moved for dismissal, arguing that they are shielded from this suit by qualified immunity.  The district court granted dismissal of so much of Ganek's Fourth Amendment claim as challenged the manner in which the government seized property from LG (*i.e.*, via search warrant rather than subpoena and with advance public notice).  *See Ganek v. Leibowitz*, 167 F. Supp. 3d at 636–38.  It also granted dismissal of so much of Ganek's Fifth Amendment claim as pleaded a "stigma plus" injury and a substantive due process violation.  *See id.* at 647.[4]

The district court declined, however, to dismiss the remaining Fourth Amendment claim, concluding that Ganek had adequately alleged a deliberate or reckless misstatement of material fact in the warrant affidavit that could be deemed necessary to a finding of probable cause.  *See id.* at 634–36.  As to the Fifth Amendment procedural due process claim, the district court ruled that Ganek had plausibly alleged defendants' fabrication of evidence to secure a

---

[4] Because Ganek does not here cross-appeal the dismissal of these claims, we do not now discuss them further.

9

search warrant, as a result of which he was deprived of tangible property seized during the LG search, and it rejected the idea that Fed. R. Crim. P. 41 provided sufficient remedial process. *See id.* at 638, 640–41. As to the Fifth Amendment failure-to-intercede claim, the district court concluded that the non-supervisor defendants may have had a duty to intervene before an affidavit containing a material misstatement was submitted to the magistrate judge, while the supervisor defendants may have been obligated to limit collateral damage by correcting the misstatement prior to LG's closure. *See id.* at 642–44. Because Ganek had pleaded that the supervisor defendants "were kept abreast of developments, prioritized the prosecution of highlevel executives, and tipped the *Wall Street Journal*," the district court deemed it at least plausible that they would have learned the truth about Adondakis's November 2, 2010 statements either before or after the submission of the flawed affidavit to the magistrate judge. *Id.* at 646.

Defendants timely filed this appeal.

### DISCUSSION

### I. Standard of Review

We review *de novo* the denial of a motion to dismiss a complaint based on qualified immunity, accepting all plausible allegations as true and drawing all reasonable inferences in plaintiff's favor. *See Garcia v. Does*, 779 F.3d 84, 91 (2d Cir. 2015).

Qualified immunity—a concept derived from common law— affords law enforcement officers a broad shield from claims for money damages arising from the performance of their duties. *See White v. Pauly*, 137 S. Ct. 548, 551 (2017) (reiterating that qualified immunity is "an immunity from suit," not simply from liability

10

(internal quotation marks omitted)); *Raspardo v. Carlone*, 770 F.3d 97, 111 (2d Cir. 2014) (same). The shield applies "unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)); *accord Carroll v. Carman*, 135 S. Ct. 348, 350 (2014); *Zalaski v. City of Hartford*, 723 F.3d 382, 388 (2d Cir. 2013).

If a plaintiff cannot make the first showing, *i.e.*, a violation of constitutional rights, no further inquiry is necessary "because where there is no viable constitutional claim, defendants have no need of an immunity shield." *Zalaski v. City of Hartford*, 723 F.3d at 388. But even where constitutional injury is shown, the shield applies unless plaintiff can also show that the right violated was "clearly established at the time of defendant's actions." *Id.*; *see Ashcroft v. al-Kidd*, 563 U.S. at 735.[5] To make this "clearly established" showing, a plaintiff need not identify a case directly on point, but precedent must have spoken with sufficient clarity to have placed the constitutional question "beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. at 741; *accord White v. Pauly*, 137 S. Ct. at 552 (stating that "clearly established" showing requires "identif[ication of] a case where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment"). That determination is made not from the perspective of courts or lawyers, but from that of a

---

[5] The two-step inquiry need not always be conducted sequentially; in short, a court may assume, without deciding, that the facts state a constitutional violation and, yet, grant qualified immunity on the ground that the right was not then clearly established. *See Pearson v. Callahan*, 555 U.S. 223, 227 (2009); *Zalaski v. City of Hartford*, 723 F.3d at 388–89.

reasonable officer in the defendant's position. *See Saucier v. Katz*, 533 U.S. 194, 202 (2001) ("The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to *a reasonable officer* that his conduct was unlawful in the situation he confronted." (emphasis added)), *overruled in part on other grounds by Pearson v. Callahan*, 555 U.S. 223, 227 (2009); *accord Zalaski v. City of Hartford*, 723 F.3d at 389. The standard is deliberately "forgiving," *Amore v. Novarro*, 624 F.3d 522, 530 (2d Cir. 2010) (internal quotation marks omitted), in order to give public officials "breathing room to make reasonable but mistaken judgments" without fear of disabling liability, *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) (internal quotation marks omitted). Thus, as has often been observed, qualified immunity protects "'all but the plainly incompetent or those who knowingly violate the law.'" *Ashcroft v. al-Kidd*, 563 U.S. at 743 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

Applying these principles here, we conclude that defendants are entitled to qualified immunity and, therefore, to dismissal of plaintiffs' claims.

## II. Fourth Amendment Claim

### A. Probable Cause

The Fourth Amendment prohibits "unreasonable searches and seizures." U.S. Const. amend. IV. While a search pursuant to a warrant issued by a judicial officer upon a finding of probable cause is presumptively reasonable, *see Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir. 1991), that presumption can be defeated by showing that a defendant (1) "knowingly and deliberately, or with a reckless disregard of the truth," procured the warrant, (2) based on "false

statements or material omissions," that (3) "were necessary to the finding of probable cause," *Velardi v. Walsh*, 40 F.3d 569, 573 (2d Cir. 1994); *accord McColley v. Cty. of Rensselaer*, 740 F.3d 817, 823 (2d Cir. 2014). Ganek asserts that this is such a case. He claims that defendants procured a warrant to search his LG office by falsely representing that Adondakis had told law enforcement officials that he advised Ganek of the inside source of the information being conveyed to him when, in fact, Adondakis specifically denied telling Ganek that the information came from an inside source.

Defendants challenge the district court's determination that Ganek's pleadings satisfactorily allege a knowingly false statement necessary to the warrant. We need not here decide whether the affidavit's misrepresentation of Adondakis's statement was knowingly false because, even if we assume it was, we conclude that the statement was not necessary to probable cause.

To determine whether a false statement was necessary to a finding of probable cause, we consider a hypothetical corrected affidavit, produced by deleting any alleged misstatements from the original warrant affidavit and adding to it any relevant omitted information. *See Soares v. Connecticut*, 8 F.3d 917, 920 (2d Cir. 1993); *accord Escalera v. Lunn*, 361 F.3d 737, 743–44 (2d Cir. 2004). If probable cause is lacking after such correction, then the false statement was "necessary" to secure issuance of the warrant. In that case, defendants would be entitled to qualified immunity only at the second step of analysis, *i.e.*, if a similarly situated law enforcement official could have held an objectively reasonable—even if mistaken—belief that the corrected affidavit demonstrated the necessary probable cause. *See Escalera v. Lunn*, 361 F.3d at 744 (holding that if corrected affidavit provides "objective basis to

13

support arguable probable cause, remaining factual disputes are not material to the issue of qualified immunity and summary judgment should be granted to the defendant on the basis of qualified immunity"). On the other hand, "if probable cause remains" after the warrant is corrected, plaintiff has suffered no violation of Fourth Amendment rights, and defendants would be entitled to qualified immunity and dismissal at the first step of analysis. *Smith v. Edwards*, 175 F.3d 99, 105 (2d Cir. 1999) (Sotomayor, *J.*) (internal quotation marks omitted). That is this case.

To explain, we start by stating what is well established at law: that probable cause to search exists where circumstances indicate a "fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983); *accord Walczyk v. Rio*, 496 F.3d 139, 157 (2d Cir. 2007). This is not to be confused with probable cause to think that the person whose premises are to be searched is implicated in the crime. The Supreme Court has expressly stated that where authorities do

> not seek to seize 'persons' but only those 'things' which there is probable cause to believe are located on the place to be searched, there is no apparent basis in the language of the [Fourth] Amendment for also imposing the requirements for a valid arrest—probable cause to believe that the third party is implicated in the crime.

*Zurcher v. Stanford Daily*, 436 U.S. 547, 554 (1978); *accord United States v. Martin*, 426 F.3d 83, 86 (2d Cir. 2005) (holding it "untenable to conclude that property may not be searched unless its occupant is reasonably suspected of a crime and is subject to arrest" (internal quotation marks omitted)).

We note this distinction at the outset because much has been made by Ganek and, to a degree, the district court about whether or not Ganek knowingly traded on inside information. *See Ganek v. Leibowitz*, 167 F. Supp. 3d at 635 (faulting warrant for "treating [Ganek] as if he were directly implicated in an insider trading scandal"). While evidence that Ganek knowingly traded on inside information would enhance probable cause to search his office, the absence of such *mens rea* evidence would not preclude probable cause for such a search. One has only to imagine a scenario where the government seeks to search the residence of a person who left a box on a subway car that exploded and killed numerous persons. The person may have known the contents of the box when he acted, or he may have been an unwitting dupe. No matter. Whatever his *mens rea*, his involvement in the *actus reus* of a crime would sufficiently establish probable cause to search his residence for criminal evidence pertaining to the bombing. So here, where the warrant affidavit clearly alleges knowing insider trading by various LG employees, as well as Ganek's trading on some of the same inside information, and where correction of the affidavit leaves only his *mens rea* at issue, there was at least a fair probability to think that his office was among the LG premises where evidence of an insider trading scheme would be found.

Before explaining this conclusion more fully, we make a further general observation about probable cause. As the Supreme Court has explained, this is a "fluid" standard, which is not usefully analogized to a *prima facie* case, or even to a preponderance (*i.e.,* more likely than not) showing of criminal activity. *Illinois v. Gates*, 462 U.S. at 232, 235; *see Walczyk v. Rio*, 496 F.3d at 156–57. To be sure, probable cause demands more than a "mere suspicion" of wrongdoing, *Mallory v. United States*, 354 U.S. 449, 454 (1957), but

15

when, as here, a person's conduct satisfies the *actus reus* of a crime, we have moved well beyond mere suspicion. *See Illinois v. Gates*, 462 U.S. at 231 (observing that probable cause does not demand "hard certainties," but only "probabilities," determined by looking to "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act" (internal quotation marks omitted)); *Florida v. Harris*, 568 U.S. 237, 244 (2013) (observing that probable cause is "practical," "common-sensical," "all-things-considered" standard).

With these principles in mind, we consider what a corrected version of the 37-page affidavit would look like after (a) deleting the allegedly false assertions that Adondakis informed Ganek as to the inside sources of the information conveyed to him, and (b) adding (in italics) the undisclosed fact that Adondakis actually said he did *not* inform Ganek that communicated information came from inside sources. Such a warrant can be summarized as follows:

1. Ganek and Chiasson were co-founding partners of LG, which was located at 888 Seventh Avenue in Manhattan. Chiasson was the fund's director of research. *See* J.A. 94, ¶ 10; *97*, ¶ 11; *100*, ¶ 13.f.

2. At the relevant times (2009–2010), Adondakis was an employee of LG who researched and analyzed public technology companies. *See id.* at 98, ¶ 13.a.–b.

3. In the course of investigating insider trading schemes during that time period, the FBI intercepted telephone conversations of Adondakis knowingly and repeatedly receiving inside information from third-party consultants. *See id.* at 80–93, ¶ 8.a.–d.

4. In October 2010, FBI agents approached Adondakis (among others) about the possibility of his cooperating in a

16

broad investigation of insider trading. In early November, Adondakis agreed to cooperate and admitted his participation in obtaining inside information on multiple occasions. *See id.* at 96–97, ¶ 11; 102, ¶ 14.a.

5. Adondakis further revealed to law enforcement authorities that,

   a. he had both "provid[ed] the Inside Information to DAVID GANEK, ANTHONY CHIASSON, [Third Person,] among others, at Level Global Investors who then executed and caused others to execute securities transactions based in part on the Inside Information," and "exchang[ed] that Inside Information with other individuals," *id.* at 97, ¶ 11;

   b. his conversations communicating inside information would "take place in, among other locations, the offices of GANEK, CHIASSON, and [Third Person]," *id.* at 100, ¶ 13.e.;

   c. he had informed Chiasson and [Third Person,] *but not Ganek*, of the inside sources of the information conveyed to them, *see id.* at 98–99, ¶ 13.c. & e.;

   d. he had saved notes of conversations with insiders regarding information received from them to the shared network drive at LG, which, in turn, was maintained and kept on LG's servers, *see id.* at 98, ¶ 13.c.;

   e. up until about October 16, 2009, he had used his LG email address to exchange inside information with several colleagues at other money managers, sometimes forwarding emails received from such colleagues and containing inside information to, among other people, Chiasson, *see id.* at 99, ¶ 13.d.;

   f. his LG emails were maintained on LG's servers, *see id.*;

17

g. after the October 16, 2009 arrest of Raj Rajaratnam, a separate hedge fund's founder, and others for insider trading, Adondakis and colleagues with whom he exchanged inside information at other money managers stopped using their work email addresses and started to use personal email addresses to communicate with each other, *see id.*

6. In or about October or November 2010, a Dell employee admitted to FBI agents that he had provided inside information to various clients, "including Level Global Investors, in exchange for money." *Id.* at 102–03, ¶ 14.b.

7. From May to August 2010, FBI agents monitoring the cellphone conversations of third-party consultant John Kinnucan intercepted his communications with, *inter alia*, Chiasson and [Third Person] of LG, which revealed these two men's knowing receipt of inside information from Kinnucan distinct from that provided by Adondakis. *See id.* at 93–96, ¶¶ 9–10.

8. In October 2010, when FBI agents solicited Kinnucan's cooperation, he not only refused, but also, on October 26, 2010, sent an email to some 20 clients disclosing both the federal contact and his refusal. *See id.* at 104, ¶ 16.

9. On November 19 and 20, 2010, the *Wall Street Journal* reported these Kinnucan developments and further stated that federal authorities had pursued a "Vast Insider Trading Probe" over three years and were preparing insider trading charges against consultants, investment bankers, hedge-fund and mutual-fund traders, and analysts across the country. *See id.* at 103–04, ¶¶ 15–16.

10. Following publication of the first *Wall Street Journal* report, a confidential source working at an unidentified hedge fund informed FBI agents that his supervisor had directed him "to delete and discard evidence of their participation

18

in illegal insider trading and wire fraud schemes." *Id.* at 105, ¶ 17.

11. Based on experience and training, the affiant reported knowledge that,

a. participants in insider trading and fraud schemes frequently maintain paper and electronic records of

    i. communications relating to the inside information,

    ii. communications relating to trades executed in reliance on such information,

    iii. the transfers of money and proceeds related to such schemes, and

    iv. names, addresses, and contact numbers for associates in the schemes, *see id.* at 107–08, ¶ 19.a. & b.;

b. participants in insider trading and fraud schemes often use computers, cellphones, and other electronic devices to store documents and to send and/or receive email communications and text messages, *see id.* at 108, ¶ 19.c. & d.;

c. emails deleted from individual computers will often remain stored on the related server, *see id.* at 109, ¶ 19.e.

As thus corrected, the affidavit demonstrates probable cause to search Ganek's office as well as the rest of the LG premises identified in the warrant.[6]

---

[6] Precedent instructs that, in applying the corrected affidavit doctrine, a court properly examines "all of the information the officers possessed when they applied for the [search] warrant." *Escalera v. Lunn*, 361 F.3d at 744. Adondakis's testimony in the Chiasson trial suggests that, at the time defendants sought the LG warrant, they may have possessed additional information as to the manner in

*First*, and at a minimum, the facts detailed give rise to a "fair probability" that evidence of insider trading and related crimes as committed by the cooperator *Adondakis* would be found in the LG premises, including Ganek's office. Adondakis, a former LG employee, admitted knowingly procuring inside information that he conveyed to various persons within LG—Ganek, Chiasson, Brenner, and others—with the expectation that it be traded on. Ganek's office was one of the LG locations where Adondakis conveyed such information. Ganek, Chiasson, Brenner, and others in fact traded and caused others to trade on the information provided by Adondakis. Thus, whether or not each recipient—and Ganek, specifically—knew that he was trading on inside information, there was probable cause to search each recipient's office, including computers and electronic devices, for records of communications with Adondakis and of the ensuing trades, simply as evidence of Adondakis's criminal conduct. Ganek can point to no law supporting his assertion, repeated at oral argument, that the possibility of recovering some of these records from LG equipment used by Adondakis or from LG servers defeats probable cause to search the offices of recipients of Adondakis's inside information for evidence of transmittal and receipt.

*Second*, the facts detailed in the corrected affidavit further demonstrate a "fair probability" that evidence of criminal conduct

---

which inside information was conveyed to Ganek. *See, e.g.*, *United States v. Newman*, No. 12-cr-121 (RJS), Trial Tr. 1779, 1801–03, ECF No. 199 (Dec. 21, 2012). Because these facts are not part of the record on appeal, however, we do not consider them part of the corrected affidavit.

by *persons other than Adondakis* would be found in the LG premises, including Ganek's office. The affidavit reveals that numerous persons within LG in addition to Adondakis—Ganek, Chiasson, Brenner, and others—received and then traded on inside information, using still other employees to effect such trades. Such evidence of receipt and trading is enough by itself to supply probable cause to search each recipient's office for evidence of the overall insider trading scheme.

Nor is a different conclusion warranted because a corrected affidavit shows that, at the time a search warrant was sought for LG's offices, the government had developed direct evidence of *knowing* insider trading only as against Adondakis, Chiasson, and Brenner, and not as against Ganek. As earlier observed, probable cause to search a location, such as Ganek's office, for evidence of a crime does not require probable cause to think that the person whose premises is to be searched is himself a knowing participant in the criminal activity under investigation. It requires only probable cause to think that evidence of a crime—by whomever committed—will be found in the place to be searched. *See Zurcher v. Stanford Daily*, 436 U.S. at 554; *accord United States v. Martin*, 426 F.3d at 86. That probable cause was established by the fact that Ganek's office was one of the LG locations where Adondakis admitted conveying inside information.

In any event, this is not a case in which there was *no* evidence of Ganek's involvement in insider trading. To the contrary, the *actus reus* elements of the crime are plainly asserted in the corrected affidavit: (1) Ganek had received inside information from Adondakis, and (2) he had traded on it. Only his *mens rea* was questionable. The law has long recognized that probable cause does

21

not demand evidence of every element of a crime—not even to support a person's arrest. *See Gonzalez v. City of Schenectady*, 728 F.3d 149, 155 (2d Cir. 2013). Indeed, the law is particularly tolerant with respect to the *mens rea* element of a crime on a probable cause showing. *See, e.g.*, *Zalaski v. City of Hartford*, 723 F.3d at 393 (observing that because of practical restraints in ascertaining knowledge and intent, "the latitude accorded to officers considering the probable cause issue in the context of mens rea crimes must be correspondingly great" (internal quotation marks omitted)). Such tolerance is especially warranted here, where the corrected affidavit shows that various persons closely associated with Ganek at LG were knowingly trading on the very same information that Ganek was receiving and using in making his own trades. In such circumstances, Ganek's *actus reus* conduct is sufficient to establish probable cause to think that further evidence of the insider trading scheme would be discovered in a search of his office.

No different conclusion is warranted by adding to the corrected warrant affidavit Adondakis's statement that he did *not* tell Ganek the inside source of the information conveyed to him. The totality of the circumstances, viewed in a common sense manner, establish at least a "fair probability" that Ganek recognized the inside source of the information in any event. He was a sophisticated trader, who would likely know without needing to be told that the sort of information being conveyed—*e.g.*, future projections provided in advance of earnings announcements—was not yet public and could not be obtained without the aid of an insider. Moreover, Ganek could have learned the inside source of the information from persons other than Adondakis, notably, Chiasson and Brenner, who were trading on the same information. Chiasson, after all, was Ganek's partner and LG's research director.

22

Thus, it was fairly probable that Ganek would have discussed with Chiasson information coming from an analyst such as Adondakis before trading on it. In any event, with so many persons within LG—Adondakis, Chiasson, Brenner—all *knowingly* trading on the same inside information, it was unlikely that Ganek would have been the sole recipient and trader ignorant of the inside source. *See Zalaski v. City of Hartford*, 723 F.3d at 393 (stating that *mens rea* assessment frequently depends on circumstantial evidence and, on probable cause inquiry, "can be made on substantially less evidence" than required for a beyond-a-reasonable-doubt finding at trial (internal quotation marks omitted)); *United States v. Newman*, 773 F.3d 438, 451 (2d Cir. 2014) (stating that fraudulent intent element of insider trading can be established "solely through circumstantial evidence"), *abrogated on other grounds by Salman v. United States*, 137 S. Ct. 420 (2016).

In short, the mere possibility that Ganek unwittingly traded on inside information cannot defeat the probable cause to search Ganek's office that is evident from the totality of the corrected affidavit. *See, e.g.*, *Fabrikant v. French*, 691 F.3d 193, 216 (2d Cir. 2012) (observing that innocent explanation consistent with facts alleged does not negate probable cause). Nor can Ganek persuasively argue that "the suspected criminal activity of a few [other] employees" was all that "justified an absolute and complete rummaging search of anyone who interacted with them." Appellee's Br. 34. As noted, Ganek himself committed the *actus reus* element of insider trading. When one considers that fact, particularly in light of circumstantial evidence making Ganek's culpable *mens rea* fairly probable, the corrected affidavit establishes probable cause to search Ganek's office for evidence of his own criminal conduct as well as for that of Adondakis and others at LG involved in insider trading.

23

We reach this conclusion, moreover, as a matter of law because there can be no genuine dispute as to a reasonable judicial officer issuing the challenged search warrant upon review of the corrected affidavit. *See Smith v. Edwards*, 175 F.3d at 106; *Velardi v. Walsh*, 40 F.3d at 574; *Soares v. Connecticut*, 8 F.3d at 920–21. Assuming that such a warrant issuance question might arise where the credibility of certain evidence (*e.g.*, from a source with a motive to lie), or the sufficiency of corroboration (*e.g.*, for an anonymous tip) informs a probable cause determination, *see McColley v. Cty. of Rensselaer*, 740 F.3d at 824–26, that is not this case. The corrected affidavit cleanly deletes the alleged misrepresentation (that Adondakis disclosed the inside source of information to Ganek) and adds a correction (that Adondakis made no such disclosure). Presented with that corrected affidavit, a reasonable judicial officer who weighed the totality of facts in the corrected affidavit could only find probable cause established. The district court erred in concluding otherwise. *See Walczyk v. Rio*, 496 F.3d at 158.

Accordingly, we conclude that Ganek cannot show that his Fourth Amendment rights were violated by the alleged misstatement in the Trask warrant affidavit because a corrected affidavit still establishes probable cause to search the LG premises, including Ganek's office. Thus, defendants are entitled to qualified immunity and dismissal on this part of Ganek's Fourth Amendment claim.

### B. Scope of Warrant

Although Ganek criticizes the "wide-ranging" and "expansive" scope of the warrant, Appellee's Br. 32, 35, the basis for that criticism appears to be his professed non-involvement in the insider trading under investigation, *see id.* at 32 (emphasizing that

24

warrant is "expansive" because it permits search of office used by person (*i.e.*, Ganek) "not implicated in the wrongdoing under investigation"); *id.* at 35 ("There is no basis given for why this exhaustive search, foraging through all of [Ganek's] files . . . would have been necessary or justified assuming Ganek was believed only to be an unwitting participant in others' alleged crimes."). In short, in Ganek's view, his office and effects should not have been searched at all in the absence of evidence that he knowingly participated in insider trading. We have already rejected this argument in our immediately preceding discussion of probable cause.[7]

Even if we construe Ganek's pleadings to raise a distinct challenge to the scope of the LG search warrant, however, he states no Fourth Amendment violation because the authorized search did not "outrun[] the probable cause supporting the warrant." *United States v. Clark*, 638 F.3d 89, 94 (2d Cir. 2011).

The warrant authorized a search of "the premises," which was defined to include, *inter alia*, Ganek's office and any computers or

---

[7] Given our conclusion that probable cause existed to search Ganek's office, any damages awarded based on overbreadth could only be nominal in any event because Ganek effectively concedes that the loss of his business is attributable to his having been the subject of a search at all. Insofar as he argues on appeal that LG's "sophisticated investors could distinguish between a search of the principal for evidence implicating other employees and one indicating Ganek himself was a target of the [investigation]," Appellee's Br. 35 n.7, there is no basis to conclude that a corrected affidavit would have to state that prosecutors did not consider Ganek a target. It had only to recount accurately what Adondakis had stated about what he did and did not tell Ganek in conveying inside information.

cellphones located therein. J.A. 68, 70 (Attachment A). Within the LG premises, agents were authorized to search for the following:

> [a]ll financial records, handwritten documents and/or notebooks, letters and correspondence, photographs, telephone and address books, identification documents, travel documents, telephone records, computers and other electronic devices, cellular telephones, and other records and documents that constitute evidence of the [crimes under investigation, specifically] securities fraud, wire fraud, money laundering, [and] commercial bribery . . . .

*Id.* at 70.

To be sure, this language sweeps broadly, but the corrected affidavit showed that inside Ganek's office, Adondakis had conversations in which he communicated inside information on which Ganek then traded. Further, Agent Trask states in the corrected affidavit that the items identified in Attachment A are of the sort where evidence of insider trading is likely to be found. Adondakis confirmed as much when he reported using LG computers and servers, as well as cellphones and personal email accounts, to carry out insider trading. Moreover, conversations intercepted over the Kinnucan wiretap, including some with LG employees, further confirmed Agent Trask's statements. Thus, the authorized search was not overbroad.

The search procedures outlined in Attachment B to the warrant reinforce this conclusion. Attachment B authorized the FBI to search the content of items identified in Attachment A for the following information:

26

(1) Any and all communications between and among David Ganek, Anthony Chiasson, [Third Person], Sam Adondakis, [redacted] consultants, . . . John Kinnucan, Broadband Research, and any third-party consultant.

(2) Any and all documents relating to, reflecting, and/or concerning information about public companies.

(3) Any and all evidence reflecting communications about trading based on information about public companies.

(4) Any and all other evidence that will assist the FBI in identifying and/or determining whether other individuals were involved in providing material, nonpublic information in violation of fiduciary and other duties of confidentiality and/or involved in trading based on material, nonpublic information.

(5) Any and all other information reflecting and/or showing and/or leading to evidence [of the crimes under investigation].

*Id.* at 73. While this attachment is also broad, the corrected affidavit supports its scope.

The corrected affidavit provides evidence that, within LG's premises, Adondakis, Ganek, Chiasson, and Brenner received and traded on inside information about multiple public companies, including Dell, Texas Instruments, Western Digital, and Seagate. Moreover, because the persons communicating that information included some who were then cooperating with the government, such as Adondakis, and some who were not, such as Kinnucan, the affidavit admitted a fair probability that the extent of insider trading

27

within LG reached beyond the public companies thus far identified by the government. Accordingly, it was appropriate to afford law enforcement authorities some latitude in searching physical and electronic record depositories for evidence of insider trading. As this court stated more than twenty-five years ago,

> [A] warrant authorizing seizure of records of criminal activity permits officers to examine many papers in a suspect's possession to determine if they are within the described category. . . . [A]llowing some latitude in this regard simply recognizes the reality that few people keep documents of their criminal transactions in a folder marked 'drug records.'

*United States v. Riley*, 906 F.2d 841, 845 (2d Cir. 1990). This reasoning applies with equal force to searches of electronic records for evidence of insider trading.

This is not to ignore the particular challenges posed by electronic searches. *See generally United States v. Ganias*, 824 F.3d 199, 215 (2d Cir. 2016) (*en banc*). But Attachments A and B effectively placed an important limit on defendants' search authority. They could search business records and communications for evidence of insider trading. No authority was given to search such personal effects and communications as Ganek might have had in his LG office (even on his computer and cellphone). This distinguishes the LG search from those limitless searches at issue in the district court cases cited by Ganek.[8]

---

[8] *See United States v. Zemlyansky*, 945 F. Supp. 2d 438, 459 (S.D.N.Y. 2013) (holding warrant overbroad because it failed to provide "any instructions" respecting seizure of clinic records by reference to "particular suspects in the case . . . the time period of the suspected conspiracy . . . the crimes alleged, or any

28

Thus, because Ganek cannot show that the breadth of the warrant violated the Fourth Amendment, defendants are entitled to qualified immunity and dismissal on this part of his Fourth Amendment claim.

## C.    Fifth Amendment Due Process Claim

The district court concluded that Ganek's allegation of a knowingly false statement in the LG warrant affidavit supported not only a Fourth Amendment claim for unreasonable search and seizure but also a Fifth Amendment claim for the deprivation of property without due process. *See Ganek v. Leibowitz*, 167 F. Supp. 3d at 638, 640–41.[9]  In reaching this conclusion, the district court relied on precedent recognizing a procedural due process cause of action for damages where "an (1) investigating official (2) fabricates information (3) that is likely to influence a jury's verdict,

---

other limits"); *United States v. Vilar*, No. 05-CR-621, 2007 WL 1075041, at *20 (S.D.N.Y. Apr. 4, 2007) (holding warrant overbroad because it permitted search of, *e.g.*, "*all* client files [and] *all* investment advisory agreements . . . regardless of whether those documents had any relation to the funds, accounts, and individuals addressed by the Warrant application" and about which there was probable cause to search (emphasis in original)); *cf. United States v. Levin*, No. 15-CR-101, 2015 WL 5602876, at *8 (S.D.N.Y. Sept. 23, 2015) (finding probable cause supported search of premises, including private office, for evidence of mail and wire fraud, because corrected affidavit indicated that employees working there may have engaged in fraudulent practices).

[9] The district court acknowledged that "some courts have held that procedural due process claims cannot be predicated upon the same factual basis as Fourth Amendment claims," but concluded that "the issue of whether Ganek's due process fabrication claim will be absorbed by the Fourth Amendment probable cause claim" was not an issue that had to be resolved on the motion then before it.  *Ganek v. Leibowitz*, 167 F. Supp. 3d at 641 n.14 (alterations and internal quotation marks omitted).  We also need not resolve the question because Ganek's due process claim fails on the merits.

(4) forwards that information to prosecutors, and (5) the plaintiff suffers a deprivation of life, liberty, or property as a result." *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 279 (2d Cir. 2016).[10]

We assume, without deciding, that Ganek could successfully clear possible threshold obstacles to his pursuit of such a due process claim.[11] We nevertheless conclude that he cannot plausibly state such a claim because, even viewing the facts in a light most favorable to him, the alleged deprivation of property resulting from the search of his office cannot be said to be the result of the fabrication of evidence in view of our corrected affidavit analysis. *See Zahrey v. Coffey*, 221 F.3d 342, 349 (2d Cir. 2000) (observing that "right at issue is a constitutional right, provided that the deprivation of liberty of which Zahrey complains can be shown to be the result of Coffey's fabrication of evidence").[12]

---

[10] Ganek frames this as a Fifth Amendment claim and so we refer to it as such herein without deciding whether such a claim does indeed find its basis in that amendment. *See Garnett v. Undercover Officer C0039*, 838 F.3d at 276 n.6 ("Whether this right is rooted in the Sixth Amendment or Fifth and Fourteenth Amendments, or both, is an issue we need not decide . . . .").

[11] Among these are (1) the availability of a *Bivens* remedy for such a due process claim, *see Ziglar v. Abbasi*, 137 S. Ct. 1843, 1857 (2017) ("[E]xpanding the *Bivens* remedy is now a 'disfavored' judicial activity." (internal quotation marks omitted)); *but see Zahrey v. Coffey*, 221 F.3d 342, 357 (2d Cir. 2000) (recognizing, without discussion, *Bivens* claim for fabrication of evidence); and (2) whether (a) the deprivation of property was "random and unauthorized" and (b) Fed. R. Crim. P. 41(g) provides a "meaningful postdeprivation remedy" for that loss, *Hudson v. Palmer*, 468 U.S. 517, 533 (1984).

[12] *Zahrey* observed that "[c]ourts considering whether the deprivation of a plaintiff's liberty is the legally cognizable result of a government officer's misconduct have approached the issue in either of two ways: (1) as a separate issue of causation, or (2) as part of the right allegedly violated." *Zahrey v. Coffey*, 221 F.3d at 349. Ganek's claim fails under either approach.

That analysis shows that probable cause existed to search Ganek's office even when the alleged fabricated statement is deleted. While *Garnett v. Undercover Officer C0039*, 838 F.3d at 277, and its predecessor case, *Ricciuti v. New York City Transit Authority*, 124 F.3d 123, 130 (2d Cir. 1997), state that probable cause for arrest is not a defense to a fabrication-of-evidence due process claim, the alleged deprivations in those cases involved separate harms beyond the deprivation—arrest—supported by probable cause. For example, in *Garnett*, the fabrication allegedly informed post-arrest charging and bail determinations. *See* 838 F.3d at 277 ("The setting of bail, which may make the difference between freedom and confinement pending trial, and the prosecutor's decision to pursue charges rather than to dismiss the complaint without further action, may depend on the prosecutor's and magistrate's assessments of the strength of the case, which in turn may be critically influenced by fabricated evidence."). Thus, where a corrected affidavit establishes probable cause to arrest or to search, a plaintiff cannot state a procedural due process claim for lost liberty or property attributable only to that arrest or search. Such a claim can be pursued, however, if the fabricated evidence causes some "further deprivation." *Id.*

Here, the only property loss alleged to have occurred without due process resulted from seizures made during the challenged search. But as we have concluded, even on a corrected affidavit, that search is supported by probable cause, the only process due.[13] Thus,

<hr>

[13] Ganek cannot claim that the affidavit misstatement caused a further loss of property—specifically, his business—without due process. The Trask affidavit was not unsealed until March 1, 2010, some weeks *after* Ganek closed LG on February 11, 2010. Thus, it is apparent that the due process injuries of which he complains are all attributable to the challenged search of his office,

31

because Ganek cannot show a procedural due process violation, defendants are entitled to qualified immunity and to the dismissal of this part of his Fifth Amendment claim.

### D. Failure-To-Intercede Claim

The district court denied defendants' motion to dismiss Ganek's failure-to-intercede claim, which it construed to apply both to (1) non-supervisor defendants, for their failure to correct the affidavit misstatement prior to issuance of the warrant; and (2) supervisor defendants, for their failure to clarify publicly that Ganek was not a target of the insider trading probe. *See Ganek v. Leibowitz*, 167 F. Supp. 3d at 642 ("It is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." (internal quotation marks omitted)).

Ganek cannot plausibly claim that he suffered constitutional harm from defendants' failure to correct a misstatement in a warrant affidavit that would have stated probable cause to search Ganek's office even on correction. *Cf. Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994) ("An officer who fails to intercede is liable *for the preventable harm* caused by the actions of the other officers . . . .") (emphasis added)); *O'Neill v. Krzeminski*, 839 F.2d 9, 11–12 (2d Cir. 1988).

As for Ganek's failure-to-clarify claim, there is no constitutional right—and certainly none that is clearly established by

which we have concluded was not unlawful, and not to the public dissemination of Adondakis's false statement.

32

law—to have law enforcement officials issue public statements clarifying a person's investigative status. Indeed, in the context of ongoing investigations, it is generally thought better for law enforcement officials to make no comments about such matters unless and until they are prepared to file public charges. *See* U.S. Dep't of Justice, U.S. Attorneys' Manual § 1-7.530 (stating, subject to certain exceptions, that "components and personnel of the Department of Justice shall not respond to questions about the existence of an ongoing investigation or comment on its nature or progress").

Nor is such a right-to-clarify status established in the context of this case by precedent recognizing a constitutional obligation to protect an individual when the government itself "has created or increased the danger to the individual." *Ying Jing Gan v. City of New York*, 996 F.2d 522, 533 (2d Cir. 1993). That right has been recognized in circumstances of increased physical, often life-threatening, danger to individuals, particularly those in state custody. *See id.* (collecting cases). That is not this case. Ganek cites no precedent that constitutionally obligates government authorities to mitigate the risk of injury to reputation resulting from public knowledge of an ongoing investigation.

In sum, because Ganek fails to state cognizable claims for failure to intervene and failure to clarify, defendants are entitled to qualified immunity and to dismissal of these Fifth Amendment claims.

### E.    Claims Against Supervisor Defendants

Ganek also asserts his Fourth Amendment, procedural due process, and failure-to-intercede claims against the supervisor

33

defendants.  Because we conclude that each of those claims fails on the merits, the supervisor defendants are entitled to dismissal.

Even if Ganek had stated plausible Fourth and Fifth Amendment claims against the non-supervisor defendants, however, he fails to plead sufficient facts to attribute liability to the supervisor defendants.  As the Supreme Court has instructed, "[b]ecause vicarious liability is inapplicable to *Bivens* and § 1983 suits," a plaintiff bringing a *Bivens* claim "must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."  *Ashcroft v. Iqbal*, 556 U.S. at 676.  To satisfy this standard, Ganek had to plead facts showing each supervisor defendant's personal involvement in the submission of an intentionally or recklessly false statement to the magistrate judge.  He does not do so here.

Specifically, Ganek does not allege that any of the supervisor defendants attended the November 2, 2010 meeting at which Adondakis purportedly told defendants that he had not informed Ganek of the inside source of the  information he was sharing.  Nor does Ganek allege that any supervisor defendant actually knew that any statement attributed to Adondakis in the search warrant affidavit was not true.  He alleges only that Zabel and Leibowitz informed LG representatives that the search "had been carefully considered at the highest levels," J.A. 18, ¶ 6; and that defendant Bharara told LG's attorney that the LG search had not been authorized "without considering the consequences," *id.* at 19, ¶ 8.  From this, he argues that supervisor responsibility for the Adondakis misstatement can be inferred from

> the high-profile nature of this raid and investigation,
> the anomalous use of such a raid in an investigation of

financial crimes, the customs and practices of the FBI and U.S. Attorney's Office, and the subsequent statements about this investigation by supervisors up to and including United States Attorney Preet Bharara himself.

*Id.* at ¶ 10.

The argument does not persuade because the fact that the decision to search LG's offices was "carefully considered at the highest levels" of the U.S. Attorney's office is not enough to admit an inference that supervisors knew or should have known that a statement in the warrant affidavit, attributed to Adondakis, was false. *See Ashcroft v. Iqbal*, 556 U.S. at 680–81 (concluding that allegation that department head was "principal architect" of challenged policy was too conclusory to support claim against him for how subordinates effected policy). Certainly Ganek does not plead, either generally or with specific reference to this case, that FBI and U.S. Attorney supervisors, when reviewing search warrant applications, do not routinely rely on their subordinates to report accurately the statements made to them by cooperating witnesses. Nor do they—or could they—suggest that doing so is reckless.[14]

---

[14] The district court, relying on our panel decision in *Turkmen v. Hasty*, 789 F.3d 218 (2d Cir. 2015), concluded that "it seems entirely plausible that [non-supervisor] defendants would have run such a decision [to misrepresent Adondakis's statements] 'up the ladder' in shaping the Affidavit," *Ganek v. Leibowitz*, 167 F. Supp. 3d at 646 n.19. *Turkmen*, however, has been reversed by *Ziglar v. Abbasi*, 137 S. Ct. at 1869. In any event, the Supreme Court had earlier made clear that *plausible* does not equate to *merely possible*. *See Ashcroft v. Iqbal*, 556 U.S. at 681–82. Where an obvious explanation exists for challenged conduct—in this case, a supervisor's reliance on a subordinate's report of what the subordinate had heard a cooperator say—more than an allegation of careful supervisory review is necessary to plead the supervisor's individual

In sum, because Ganek has failed to state cognizable Fourth Amendment, procedural due process, and failure-to-intercede claims, and, in any event, because Ganek has failed to plead sufficient facts as to each supervisor defendant's personal involvement in the submission of the alleged misstatement to the magistrate judge, the supervisor defendants are entitled to dismissal of these claims.

## CONCLUSION

To summarize, we conclude that all defendants are entitled to qualified immunity and, therefore, to dismissal of all Ganek's claims.

1.     Ganek fails to plead a plausible Fourth Amendment claim of unreasonable search and seizure because a corrected affidavit supports both probable cause for and the scope of the challenged search.

2.     Ganek fails to plead a plausible Fifth Amendment claim that fabricated evidence (in the search warrant affidavit) deprived him of property without due process because the warrant would have issued on a corrected affidavit and thus any deprivation of the seized property was not the result of the fabricated evidence.

3.     Because Ganek fails to plead plausible Fourth and Fifth Amendment claims, he cannot plausibly plead that defendants' alleged failure to intercede in the challenged search caused him preventable constitutional harm.

---

responsibility for the falsehood. *See id.* (identifying "more likely" non-discriminatory motive in concluding that pleading was insufficient).

4. Ganek fails to plead any clearly established right to have federal officials state in a search warrant affidavit whether each referenced person is or is not then a target of investigation, nor a right to have federal officials so state after the fact if the search becomes public knowledge.

5. Moreover, Ganek fails to plead sufficient facts as to the supervisor defendants' personal involvement in the submission of any misstatements to the magistrate judge.

Accordingly, that part of the district court order denying defendants' dismissal motion in part is hereby REVERSED, and the case is REMANDED to the district court for entry of judgment in favor of defendants on all claims.